UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| COLBY TAYLOR, individually and as a personal representative of the ESTATE OF JAY TAYLOR, a deceased individual; LESLIE TAYLOR, individually and as a personal representative of the ESTATE OF JAY TAYLOR, a deceased individual,<br>Plaintiffs,<br>v.<br>DISCORD INC., a Delaware company,<br>Defendant. | CASE NO. 3:26-cv-05245-BHS<br><br>ORDER |

THIS MATTER is before the Court on defendant Discord's motion to compel arbitration and stay litigation. Dkt. 19.

Jay Taylor committed suicide on a livestream hosted by Discord, urged and orchestrated by a group known as "764." He was 13 years old. Plaintiffs Colby and Leslie Taylor are Jay's parents. They sue Discord on their own behalf and as the personal representatives of Jay's estate. They allege Discord knowingly and intentionally promoted sex and suicide trafficking on its platform, that its platform was defectively

unsafe in its design, and that it failed to provide adequate warnings about the danger of 764 to young users. They also allege that Discord failed to protect young users from the foreseeable risk of harm. The Taylors assert outrage and negligence claims and violations of the Washington Product Liability Act, RCW 7.72.030, and state and federal[1] sex trafficking statutes, RCW 9A.82.100 and 18 U.S.C. §§ 1591, 1595.

Discord moves to compel arbitration of Jay's estate's claims (the "survival" claims), arguing that Jay entered into a valid arbitration agreement that binds his estate and heirs. Dkt. 19 at 16. It contends that Jay accepted Discord's clearly posted Terms of Service, including the arbitration provision, when he clicked the button to create his Discord accounts. It contends that the arbitration agreement requires an arbitrator, rather than the court, to resolve threshold questions of arbitrability, including challenges based on Jay's age, whether Jay disaffirmed the contract, and contract defenses such as breach and unconscionability. Discord contends that the parents' independent claims should be stayed pending arbitration of the estate's claims.

The Taylors contend that no valid arbitration agreement exists. Dkt. 26 at 9. They contend that the Terms of Service were "barely readable" and designed to "fade into the

---

[1] On July 10, 2026, the Taylors filed a First Amended Complaint, adding a federal trafficking claim. Dkt. 36. Discord moved to strike the amended complaint as untimely and procedurally improper. Dkt. 37. The Taylors subsequently sought leave to file a Second Amended Complaint. Dkt. 39. Discord does not oppose that motion but requests that the Court resolve the pending motion to compel arbitration before setting any renewed motion to dismiss briefing.

Discord's motion to strike, Dkt. 37, is **DENIED** as moot, and the Taylors' unopposed motion for leave to file a Second Amended Complaint, Dkt. 39, is **GRANTED**. The Taylors' Second Amended Complaint, Dkt. 39-3, is the operative pleading.

background," and were particularly inconspicuous for a child of Jay's age. They argue that, even if Jay initially agreed to arbitrate, any agreement was later disaffirmed by Jay's death, the filing of this lawsuit, and his father's declaration expressly disaffirming any contract between Jay and Discord. *Id.* at 15. They assert that Discord has not shown that Jay agreed to delegate the issue of arbitrability to an arbitrator, and in any event, such delegation is procedurally unconscionable and therefore unenforceable. *Id.* at 18.

## I. BACKGROUND

Discord is an online messaging service organized into topic based virtual spaces known as "servers," where users may join and engage in conversation. Dkt. 39-3 at 8. Servers are further organized into subtopics called channels. *Id.* In text channels, users can post messages, share files, and upload images. *Id.* In voice channels, users can communicate through voice and video chat. *Id.* Users can also send private messages to other users. *Id.*

To access these services, users must first create an account through Discord's desktop app, its website, or its mobile app. Dkt. 21 at 1–2. As part of the registration process, users must enter a birth date. Robbins Suppl. Decl., Dkt. 29 at 1. Those who enter a birth date indicating that they are under 13 are blocked from creating an account, while those who indicate they are between 13 and 17 may access only age-restricted content. *Id.* at 2. Discord does not store the birth date for those indicating they are above 18. *Id.*

Jay created two accounts through Discord's website in 2019, at age 10, and a third in January 2022, at age 13. Colby Decl., Dkt. 26-1 at 2. Discord's records reflect that Jay

created each account using a birthdate indicating that he was over 18. Robbins Suppl. Decl., Dkt. 29 at 2.

Users that create an account on Discord's website may do so through either the home page or the registration page. Discord's records do not indicate which page Jay used to create the accounts.

In 2019, users registering on the home page were presented with the following:



Dkt. 19 at 8. In 2022, the home page looked like this:




Dkt. 19 at 9. In both 2019 and 2022, users were required to enter a username and click an arrow to proceed. Below the username field appeared the statement, "By registering, you agree to Discord's Terms of Service and Privacy Policy." *Id.*

In 2019 and 2022, users that created an account through the registration page were presented with the following pages:

2019




2022




*Id.* at 10. Users could not create an account and access Discord's services without clicking the "Continue" button. *Id.* at 11.

In 2022, Discord's Terms of Service[2] began with the following disclaimer:

> **IMPORTANT NOTICE: THESE TERMS OF SERVICE CONTAIN A BINDING ARBITRATION PROVISION AND CLASS ACTION WAIVER. IT AFFECTS YOUR LEGAL RIGHTS AS DETAILED IN THE DISPUTE RESOLUTION AND CLASS ACTION WAIVER SECTION BELOW. PLEASE READ CAREFULLY.**

---

[2] The Court cites to the 2020 Terms of Service, applicable at the time Jay created his 2022 account. The 2018 Terms of Service are materially the same, including the opening disclaimer which is identical to the 2020 version.

Robbins Decl, Ex. F., Dkt. 21 at 39. The Introduction section states, "By using or accessing" the Discord app or website, "you agree (i) that you are 13 years of age and the minimum age of digital consent in your country, (ii) if you are the age of majority in your jurisdiction or over, that you have read, understood, and accept to be bound by the Terms, and (iii) if you are between 13 (or the minimum age of digital consent, as applicable) and the age of majority in your jurisdiction, that your legal guardian has reviewed and agrees to these Terms." *Id.*

Under the heading, "Dispute Resolution," the Terms contained an arbitration provision:

> Except as provided herein, if we cannot resolve a dispute informally, any dispute will be resolved only by binding arbitration to be held in the U.S. state in which you reside.
>
> * * *
>
> The arbitration shall be conducted by a single arbitrator, governed by the rules of JAMS[3] that are in effect at the time the arbitration is initiated (referred to as the "JAMS Rules") and under the rules set forth in these Terms. If there is a conflict between the JAMS Rules and the rules set forth in these Terms, the rules set forth in these Terms will govern. ARBITRATION MEANS THAT YOU WAIVE YOUR RIGHT TO A JURY TRIAL. You may, in arbitration, seek any and all remedies otherwise available to you pursuant to your state's Law.

*Id.* at 48.

The arbitration agreement also included an opt-out right:

> You have the right to opt out and not be bound by the provisions requiring arbitration by sending written notice of your decision to opt out to Discord by email to arbitration-opt-out@discord.com. The notice must be sent within 90 days of this Terms of Service taking effect, or your account creation on the Service. If you do not opt out via this method, you will be bound to arbitrate disputes in accordance with the terms of these paragraphs.

[3] Judicial Arbitration & Mediation Services, Inc.

*Id.* at 49.

The Terms provide that the Federal Arbitration Act governs the interpretation and enforcement of the arbitration agreement and that California law governs "any dispute of any sort that might arise between you and the Company." *Id.* at 49, 50.

In January 2021, a Discord user created the "764" network, comprised of numerous sub-groups who shared the primary goal of inciting violence among youth users. Dkt. 39-3 at 15. One 764 member, Shahriar Javan, coerced a 12-year-old girl, L.S., to livestream herself committing self-harm and sexual acts. *Id.* at 18. Javan told L.S. that she could only continue living if she found somebody else to die. *Id.* at 19.

In mid-January 2022, Jay posted a message on the Discord LGBTQ community page that stated, "I had a sudden urge to get a pen pal so here I am!" Dkt. 39-3 at 20. On January 17, Jay received a response from L.S. and the two began to chat. L.S. encouraged Jay to commit suicide. Jay replied,

> wait actually, I kinda have some good stuff going on in life rn, and im out of my depression episode so maybe not, if I do start planning stuff again ill dm u sorry :/ the sad thing is that I was looking for someone to call with a while ago but now im doing a lot better : ((( sorryyyyyyyyyyyyyyy.

*Id.* at 20. L.S. continued to pressure Jay, asking him to die with her in a joint suicide pact. *Id.* Jay responded that he did not want to experience pain. *Id.* L.S. replied that if he used a cord, it wouldn't hurt. *Id.* Jay told L.S. that he would hang himself using an extension cord. *Id.* L.S. called Jay at Javan's direction to ensure that he followed through. *Id.* at 20–21. On January 18, at 4 am, Jay walked to a nearby Safeway supermarket and livestreamed his death. *Id.* at 21.

After Jay's passing, the FBI took Jay's phone and laptop and did not allow the Taylors' access to Jay's accounts. On June 18, 2025, Colby Taylor learned that Javan was arrested in Germany for Jay's murder. Colby Decl., Dkt. 27-3 at 2.

On February 19, 2026, the Taylors sued Discord in Pierce County Superior Court asserting both survival and individual claims. Dkt. 1-1. Discord timely removed the case here based on diversity jurisdiction. It now moves to compel arbitration on Jay's estate's survival claims, asserting that Jay validly consented to arbitrate any claims brought on his behalf. Dkt. 1. It asks the Court to stay the Taylors' wrongful death claims pending arbitration due to the risk of inconsistent rulings.

The Taylors oppose arbitration, arguing that Discord fails to show that Jay assented to the terms of the agreement. They argue that the Terms were not reasonably conspicuous for a minor to be put on notice of the agreement and that even if Jay assented, the agreement has since been disaffirmed. They argue that the Terms are unenforceable because Discord breached them by failing to disclose safety information about the dangers of the 764 group. They further argue that their own claims should not be stayed, asserting that "the core liability question" on negligence can be litigated in this Court without waiting for an arbitrator to address Jay's estate's claims.

The issues are discussed in turn.

## II. DISCUSSION

### A. Jay manifested assent to Discord's Terms of Service by clicking a button to create his account.

The Federal Arbitration Act ("FAA") makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration agreements are on an "equal footing with other contracts," and therefore, a court must "enforce them according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citation modified). Before compelling arbitration, a court must determine two gateway issues: "'(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Johnson v. Walmart Inc.*, 57 F.4th 677, 680 (9th Cir. 2023) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

When the making of an arbitration agreement is disputed, courts apply the summary judgment standard. *Hansen v. LMB Mortgage Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021); *see* Fed. R. Civ. P. 56. A court may compel arbitration only if, viewing the evidence in the light most favorable to the party opposing arbitration, no genuine dispute of material fact exists regarding the agreement's formation. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991). If, however, there

is a genuine factual dispute regarding whether the parties formed an agreement, "the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved." *Hansen*, 1 F.4th at 672.

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." [4] *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849 (9th Cir. 2022). To form a contract, the parties must manifest their mutual assent to the terms of the agreement. *Id.* (California law); *accord Wilson v. Huuuge, Inc*., 944 F.3d 1212, 1219-21 (9th Cir. 2019) (Washington law). "Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct." *Berman*, 30 F.4th at 849. In the context of online agreements, if "a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id*. at 855–56.

Courts confronted with online agreements "have devised rules to determine whether meaningful assent has been given." *Id.* The easiest agreement to enforce is a "clickwrap" agreement, in which "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order

[4] Washington is the forum state, but the Terms of Service provide that California law governs, without regard to principles of conflict of laws. Robbins Decl., Dkt. 21 at 50. The parties agree that California and Washington law do not materially differ with respect to the issues presented and both parties rely on the law of both states. The Court likewise refers to both California and Washington law.

to proceed." *Id.* at 856. At the other end of the spectrum are "browsewrap" agreements, in which "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id*; *see, e.g., Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014).

The agreements here resemble a "sign-in wrap" agreement, which falls somewhere in between a (presumptively enforceable) clickwrap agreement and a (presumptively unenforceable) browsewrap agreement. In a sign-in wrap agreement, "the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). A sign-in wrap agreement may be an enforceable contract based on inquiry notice if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (internal quotation marks omitted); *see also* S*aeedy v. Microsoft Corp*., 757 F. Supp. 3d 1172, 1190 (W.D. Wash. 2024) (applying same standard to contract governed by Washington law).

The Taylors argue that Discord fails to provide evidence of what Jay "accessed, saw, or clicked," sufficient to establish mutual assent to the agreement. Dkt. 26 at 11. The Court disagrees. The Taylors provided Discord with email addresses associated with Jay's Discord accounts. Discord responded with dates and times that Jay created those accounts. Discord also provided screenshots and sworn testimony of all possible

registration pages during those time periods. Any registration page that Jay may have used at the time was not materially different from each other. Each page required Jay to click an action button next to the hyperlinked Terms of Service.

The more significant question is whether the Terms of Service on those pages were reasonably conspicuous to establish mutual assent. To determine if the website provided "reasonably conspicuous notice of the terms to which the consumer will be bound," courts evaluate both "the context of the transaction" and "visual the placement of the notice." *Keebaugh*, 100 F.4th at 1014. "Both aspects 'should be considered together.'" *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025) (quoting *Chabolla*, 129 F.4th at 1155). "To be conspicuous, [the] notice 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Keebaugh*, 100 F.4th at 1014 (quoting *Berman*, 30 F.4th at 856). The nature of the service or goods offered and the visual aspects of every page of a multi-page transaction should be considered together.

In *Oberstein v. Live Nation Ent.*, Inc., 60 F.4th 505, 510 (9th Cir. 2023), the Ninth Circuit considered whether the following "sign-in agreement" provided the plaintiff with constructive notice of the Terms of Service:




Answering Br., Dkt. 30 at 16. The Ninth Circuit held that it did, explaining that the notice was "conspicuously displayed directly . . . below the action button," and was written in "bright blue font [to] distinguish it from the surrounding text." *Id.* at 516. The Ninth Circuit affirmed the district court's conclusion that as a matter of law "a reasonable user would have seen the notice and been able to locate the Terms via hyperlink." *Id*; *see also Saeedy*, 757 F.Supp.3d at 1195 (concluding that the user unambiguously manifested assent by clicking "Next" after being notified that doing so constituted agreement to the terms of service and privacy statement).

In *Patrick v. Running Warehouse, LLC*, 93 F.4th 468 (9th Cir. 2024), the Ninth Circuit also "found a single screen sufficiently conspicuous."

**<u>Desktop Version</u>**




Appellees' Answering Br., Dkt. 14 at 21. The Ninth Circuit explained that the notice was directly below the button that the plaintiff clicked to make his purchase, it was clear and legible, and the terms of use was "colored bright green—contrasted against the surrounding white background and adjacent black text." *Id.* at 477.

In *Berman*, by contrast, the Ninth Circuit concluded that the following notice was insufficient.




Appellants' Opening Br., Dkt. 16 at 18. The Ninth Circuit explained that the textual notice was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye." *Berman*, 30 F.4th at 856. The Court also explained that the website's design and content draws "user's attention away from the barely readable critical text." *Id.*

The notice here more closely resembles that in *Oberstein* and *Patrick*. On the 2019 home page, the "Terms of Service" hyperlink appeared in bolded white text against a black background. In 2022, it appeared in white, underlined text against a blue background. In both versions, it was the only text beneath the registration fields. Although the text was smaller than the surrounding website elements, it was not so small as to be "barely legible." *See Berman*, 30 F.4th at 856.

Courts also consider whether the transaction contemplates an ongoing relationship such that users would reasonably expect to encounter terms governing their relationship. *Oberstein*, 60 F.4th at 517; *see also Ghazizadeh v. Coursera, Inc*., 737 F. Supp. 3d 911, 925 (N.D. Cal. 2024) ("[A] user engaging in a full registration process, as opposed to a one-time purchase, is more likely to expect a continuing relationship that would put her on notice for a link to the terms of that continuing relationship."). Jay's use of Discord was not a one-time transaction or a single visit to a website. By creating an account, Jay necessarily contemplated continued access to the platform and should have reasonably expected that such access would be governed by some terms of use. *See Ghazizadeh*, 737 F.Supp.3d at 925.

To satisfy the second part of the test, the consumer must take some action that unambiguously manifests assent to the terms. Jay did so by clicking a button—the arrow button on the homepage or the continue button on the registration page—to create his account. In *Berman*, the Ninth Circuit held that clicking a large green "Continue" button was insufficient because the notice did not "explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858. As an example of what would constitute sufficient notice, the Court offered, "By clicking the Continue >> button, you agree to the Terms & Conditions." *Id*; *see also Saeedy*, 757 F. Supp. At 1195 ("sign-in wrap" agreement enforceable where new account users were presented with screen "stating that, by choosing or clicking on a button, the user indicates they agree with" the terms of service). Here, consistent with *Berman*'s example, Discord's notice expressly identified the act constituting assent: "*By registering*, you

agree to Discord's Terms of Service and Privacy Policy." Dkt. 19 at 8–9 (emphasis added).

The Taylors argue that there is "ambiguity about what action constitutes 'registering.'" Dkt. 26 at 14. But the website made the meaning of registering sufficiently clear. If Jay created his account via the registration page, the context was explicit: "Create an account" at the top of the page, followed by the notice that "[b]y registering you agree" to the Terms. If Jay instead created an account through the home page, he was prompted to select a username before being instructed that "[b]y registering you agree" to the Terms. Although the home page did not expressly state "Create an Account," the username prompt, the term "registering" in the notice, and the nature of the online messaging service made clear that the process was for account registration, and that by "registering," the user assented to the Terms of Service. *See, e.g.*, *Oberstein*, 60 F.4th at 513 ("The language 'By continuing past this page and clicking [the button], you agree to our Terms of Use' clearly denotes 'that continued use will act as a manifestation of the user's intent to be bound.'") (quoting *Nguyen*, 763 F.3d at 1177).

Whether Jay created his accounts through the home page or registration page does not alter the result. On either page, the Terms were reasonably conspicuous, and Jay manifested assent by clicking a button to create his account. An agreement to arbitrate was formed.

Generally, only a party to an arbitration agreement is bound by or may enforce the agreement. *Thomas v. Westlake*, 204 Cal. App. 4th 605, 613 n.5 (2012). However, "where [a decedent's personal representative] asserts a claim on behalf of the estate, he or she

must also abide by the terms of any valid agreement, including an arbitration agreement, entered into by the decedent." *Id*. The Taylors bring survival claims on behalf of Jay's estate. Because Jay agreed to arbitrate those claims, the Taylors are likewise bound by that agreement in pursuing them on Jay's estate's behalf.

**B. Jay agreed to delegate arbitrability to an arbitrator.**

Discord next argues that because the arbitration agreement incorporates the FAA and JAMS rules, the arbitrator must decide any post-formation challenges to the arbitrability of the agreement, including whether Jay disaffirmed the contract, the effect of his age on the capacity to contract, and other contract defenses such as unconscionability, fraud, and breach. Dkt. 19 at 16; Dkt. 28 at 12. It asserts that arbitrability disputes are for the arbitrator to decide, not the Court. *Id.*

The Taylors contend that Discord fails to identify any clear and unmistakable delegation provision in the arbitration agreement. Dkt. 26 at 18. They assert that incorporating the JAMS rules in effect "at some unknown future date" did not make those rules "logically accessible" to Jay at the time he assented. *Id.* at 19. They assert that even if Jay did assent, the delegation provision is procedurally unconscionable. They emphasize that JAMS rules were not "annexed, quoted, or hyperlinked" and that Discord failed to provide an "email, phone number, or contact for JAMS." *Id.* at 20.

"An agreement to allow an arbitrator to decide whether a dispute is subject to arbitration—i.e., its arbitrability—'is simply an additional, antecedent agreement . . . , and the FAA operates on this additional arbitration agreement just as it does on any other.'" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (quoting *Rent-A-Center*, 561

U.S. at 70). Whether an arbitrator or a court decides an arbitration agreement's validity "depends on whether there is 'clear and unmistakable' evidence that the parties agreed to delegate the validity question to the arbitrator." *Sandler v. Modernizing Med., Inc.*, 170 F.4th 1209, 1212 (9th Cir. 2026) (quoting *Rent-A-Center*, 561 U.S. at 69 n.1). When the parties do so, "a court may not override the contract" and has "no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).

A contract need not always contain an express delegation to satisfy the "clear and unmistakable" requirement. Rather, courts have found that parties clearly delegated arbitrability where they incorporated the American Arbitration Association's ("AAA") arbitration rules expressly in the agreement. *Patrick*, 93 F.4th at 480–81 ("[V]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013))). That is because Rule 6(a) of the AAA rules vests the arbitrator with "the power to rule on his or her own jurisdiction[.]" *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). The same is true for incorporation of the JAMS rules, which also expressly delegates "arbitrability disputes" to the arbitrator.[5] *Id.* at 481

---

[5] JAMS Rule 11(b) states, "[J]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are the proper parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." *Patrick*, 93 F.4th at 481.

Notwithstanding the plain language of this rule, it cannot be enforced to bypass the threshold question of mutual assent, because it is for the court—not the arbitrator—to determine

"("Incorporation of the JAMS arbitration rules by reference constitutes clear and unmistakable evidence that the parties agree to arbitrate arbitrability."); *see also Sandler*, 170 F.4th at 1212 (concluding that incorporation of the JAMS rules, "which delegate the question of the agreement's validity to the arbitrator," "evinces a 'clear and unmistakable' intent to delegate"); *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1279 (10th Cir. 2017) ("We conclude that by incorporating the JAMS Rules into the Agreement, [the parties] evidenced a clear and unmistakable intent to delegate questions of arbitrability to an arbitrator.").

Other judges from this district have reached the same conclusion. *See, e.g.*, *Reynolds v. Safeway, Inc.*, No. C22-0197TL, 2023 WL 2560853, at *4 (W.D. Wash. Mar. 17, 2023); *Briggs v. Serv. Corp Int'l*, No. C22-1646JLR, 2023 WL 2075958, at *7 (W.D. Wash. Feb. 17, 2023); *Moreno v. T-Mobile USA, Inc.*, No. 2:22-CV-00843-JHC, 2023 WL 401913, at *5 (W.D. Wash. Jan. 25, 2023); *see also Nicole Firlej, et al. v. Petrosian Esthetic Enters., LLC, et al.*, No. 2:26-CV-01030-MWC-AGR, 2026 WL 2456684, at *7 (C.D. Cal. June 11, 2026).

Discord's arbitration agreement incorporates the JAMS rules:

> The arbitration shall be conducted by a single arbitrator, governed by the rules of JAMS that are in effect at the time the arbitration is initiated (referred to as the 'JAMS Rules') and under the rules set forth in these Terms. If there is a conflict between the JAMS Rules and the rules set forth in these Terms, the rules set forth in these Terms will govern.

Dkt. 21 at 48.

---

in the first instance whether an agreement to arbitrate was ever formed. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 150 (2024).

The Taylors argue that the Terms fail to incorporate the JAMS Rules because the rules are not hyperlinked. But neither the Ninth Circuit nor district courts applying Ninth Circuit precedent have treated the presence of a hyperlink as necessary to incorporation. Indeed, although those courts did not specifically address the issue, several found arbitration rules incorporated where the agreements appeared to contain no hyperlink to those rules. *See, e.g.*, *Oracle*, 724 at 1071 ("Arbitration shall be administered: (i) by the American Arbitration Association (AAA), (ii) in accordance with the rules of the United Nations Commission on International Trade Law (UNCITRAL) (the 'Rules') in effect at the time of arbitration."); *Reynolds*, 2026 WL 2456684, at *2 (Any and all Claims shall be submitted for binding arbitration in accordance with the JAMS Streamlined Arbitration Rules & Procedures that are in effect at the time arbitration is initiated ('JAMS Rules').")

The Ninth Circuit reached the same conclusion as to minor plaintiffs who entered into agreements governing their use of video games:

> [T]he teenagers clearly and unmistakably agreed to arbitrate questions of arbitrability because the arbitration agreement incorporates AAA rules. [Their] degree of sophistication does not change this conclusion because, under Washington law, '[c]ourts presume that parties to an agreement have read all parts of the entire contract and intend what is stated in its objective terms,' and "[c]ontractual language must . . . be interpreted in light of existing . . . rules of law[.]

*G.G. v. Valve Corp.*, 799 F. App'x 557, 558-59 (9th Cir. Apr. 3, 2020) (citation modified). The fact that Discord's Terms of Service did not also provide a hyperlink to the JAMS Rules does not make their incorporation any less clear.

Finally, the Taylors argue that the delegation provision is procedurally unconscionable under Washington law because it consists of a single statement incorporating the JAMS rules without providing a hyperlink or contact information for JAMS. Discord responds that the question of unconscionability is delegated to the arbitrator and, even if were not, the argument fails because Terms of Service may incorporate JAMS rules by reference.

Generally, once a court has determined that the parties clearly and unmistakably delegated arbitrability questions concerning the agreement's enforceability and scope to an arbitrator, those questions are not for the Court. But where a party specifically challenges the delegation provision itself as unconscionable, the Court must resolve that challenge. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015) (citing *Rent–A–Center*, 561 U.S. at 63); *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1210 (9th Cir. 2016) ("When considering an unconscionability challenge to a delegation provision, the court must consider only arguments 'specific to the delegation provision." (quoting *Rent–A–Center*, 561 U.S. at 73)).

In light of the parties' apparent agreement that Washington law governs the unconscionability issue, *see* Dkts. 26 at 19; 28 at 15, the Court applies Washington law in assessing whether the delegation provision is unconscionable. Under Washington law, a finding of either procedural or substantive unconscionability is sufficient to void an agreement. [6] *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d 38, 54 (2020). Procedural

[6] Under California law, both procedural and substantive unconscionability must be present, but not to the same degree, such that, "[t]he more substantively oppressive the contract

unconscionability is "the lack of meaningful choice, considering all the circumstances surrounding the transaction including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms [were] hidden in a maze of fine print." *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wn.2d 293, 303 (2004).

The Court has already concluded that the parties clearly and unmistakably delegated questions of arbitrability to the arbitrator by incorporating the JAMS rules. That express incorporation put the parties on notice that those rules govern; the absence of a hyperlink does not make them hidden or unfairly surprising.

Discord's motion to compel arbitration on Jay's estate's survival claims is **GRANTED** and those claims are **STAYED** pending arbitration. Any challenges to the enforceability of the arbitration agreement shall be addressed by the arbitrator.[7]

**C. A stay is not warranted.**

Under the FAA, a district court "must stay proceedings for claims and issues 'referable to arbitration' pending resolution of the arbitration." *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 832 (9th Cir. 2019); 9 U.S.C. § 3. A court retains discretion to stay nonarbitrable claims or issues pending arbitration based on considerations of economy and efficiency. *Maguire Ins. Agency, Inc. v. Amynta Agency, Inc.*, 652 F. Supp. 3d 1313,

---

term, the less evidence of procedural unconscionability is required[,]" and vice versa. *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1089 (9th Cir. 2024) (citation modified).

[7] The Taylors also argue that Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act preempts or otherwise renders the arbitration agreement unenforceable. Dkt. 26 at 24. Because the argument concerns the enforceability of the arbitration agreement, this issue is for the arbitrator to decide.

1327 (W.D. Wash. 2023). Staying nonarbitrable claims is generally appropriate only when "the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002). "[A]voiding a duplication of effort" is another ground that may justify granting a stay. *United States ex rel. Newton v. Neumann Caribbean Int'l, Ltd.*, 750 F.2d 1422, 1427 (9th Cir. 1985). The Ninth Circuit has noted a "preference for proceeding with the non-arbitrable claims when feasible." *United Commc'ns*, 46 F. App'x at 415.

Discord argues that a stay of the Taylors' individual claims is warranted because "the survivor and wrongful death claims arise from identical facts and turn on the same threshold question about Discord's liability." Dkt. 28 at 18. It asserts that allowing both proceedings to advance would risk inconsistent determinations with the same factual and legal issues.

The Taylors argue that the claims are "legally distinct" and require proof of facts that will not necessarily be resolved in an arbitration proceeding, including the nature of the parent-child relationship, the Taylors' own personal damages, and the economic loss to Jay's estate. Dkt. 26 at 23. They also contend that staying their claims would hold them in "legal limbo indefinitely, unable to pursue justice in the only forum where they have the right to be heard." *Id.*

The Court agrees that a stay is not warranted here. The Taylors never agreed to arbitrate and requiring them to await arbitration of Jay's estate's claims would delay their right to litigate claims that they are entitled to pursue in court. Nor would a stay

materially conserve judicial resources. The Taylors' wrongful death claims must ultimately be litigated regardless of the outcome of the arbitration and Discord does not contend that the arbitrator's findings would bind the Taylors or this Court. Although parallel proceedings present risk of inconsistent rulings, that risk does not outweigh the prejudice to the Taylors from delaying resolution of their claims. Nothing in this Order, however, precludes the arbitrator from staying the arbitration proceedings if warranted.

Discord's motion to stay the Taylors' individual wrongful death claims pending arbitration is **DENIED**.

## III. ORDER

Discord's motion to compel arbitration and stay litigation, Dkt. 19, is **GRANTED in part and DENIED in part.** The Taylors' motion to file their Second Amended Complaint is **GRANTED**. Discord's motion to dismiss, Dkt. 22, and motion for protective order, Dkt. 41, are **DENIED as moot** with leave to re-file.

Dated this 14th day of September, 2026.

BENJAMIN H. SETTLE
United States District Judge